UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Anna Wallace,

        Plaintiff,

       v.                               Civil Action No. 5:11-cv-26

Commissioner of Social Security,

        Defendant.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 10, 15)

Plaintiff Anna Wallace brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying her application for disability insurance

benefits.  Pending before the Court are Wallace's motion to reverse the Commissioner's

decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 15).  For the

reasons stated below, I recommend that Wallace's motion be GRANTED, in part; the

Commissioner's motion be DENIED; and the matter be REMANDED for further

proceedings and a new decision.

## <u>Background</u>

Wallace was thirty-four years old on the alleged disability onset date of April 15,

2003.  (AR 22, 42, 97, 120.)  She dropped out of school during the ninth grade, but

received her GED thereafter.  (AR 22-23, 142, 368.)  She has experience working as a

gas station attendant, a restaurant cleaner, a housekeeper, a janitor, and a childcare

provider.  (AR 22-24, 27-28, 35, 135, 144.)  Wallace was married, and lived with her mother, husband, and two daughters, born in 1998 and 2006 respectively, during most of the alleged disability period.  (AR 20-21, 24, 368.)  In April 2009, she separated from her husband of approximately eight years.  (AR 20-21, 368, 568.)  The record reflects that Wallace has a history of significant trauma, growing up the youngest in a family of eleven children, with alcoholic parents.  (AR 368, 524, 567-68, 600-01.)  She has reported to her medical providers that her father raped two of her sisters and physically abused her brothers, leaving home when Wallace was five years old.  (*Id.*)  She has also reported that one of her brothers sexually abused her.  (*Id.*)  At the age of ten, Wallace was placed in foster care.  (AR 601.)

In October 2008, Wallace filed an application for disability insurance benefits, alleging a disability onset date of April 15, 2003.  (AR 97-100.)  Therein, she claimed that she was unable to work as a result of severe depression, anxiety, post-traumatic stress disorder ("PTSD"), and chronic back pain.  (AR 134.)  She stated that "anxiety has always been a deciding factor in [her] life," and she "ha[s] lived with fear in one shape or another [her] entire life because of the abuse [she] witnessed as a child," resulting in, for example, her being unable to go out without "get[ting] really nervous and scared" and "feeling crowded and having a panic attack."  (*Id.*)  She further stated that, because of her back pain and depression, she was unable to get out of bed some days.  (*Id.*)  In accord, at the administrative hearing on her application, Wallace reported that, on a good day, she played with her daughter and cleaned the house, "doing the mommy thing"; but on a bad day, she would not get out of bed and was "not a very good mother at all."  (AR 32.)

2

Wallace's application was denied initially and on reconsideration.  (AR 38-39, 48-50, 53-55.)  On August 18, 2010, Administrative Law Judge ("ALJ") Robert Klingebiel conducted a hearing on the application.  (AR 15-37.)  Wallace appeared and testified, and was represented by counsel.  (*Id.*)  On September 21, 2010, the ALJ issued a decision finding that Wallace was not disabled under the Social Security Act from her alleged onset date of April 15, 2003 through the date last insured, June 30, 2009.  (AR 7-14.)  On February 7, 2011, the Decision Review Board notified Wallace that it had not completed its review of the claim during the time allowed, making the ALJ's decision final.  (AR 1-3.)  Having exhausted her administrative remedies, Wallace filed her Complaint in this case on January 31, 2011.  (*See* Doc. 4.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

3

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The fifth and final step requires the ALJ to determine whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

Employing this sequential analysis, ALJ Klingebiel first determined that Wallace had not engaged in substantial gainful activity during the period from her alleged onset date of April 15, 2003 through her date last insured of June 30, 2009.  (AR 9.)  At step two, the ALJ found that Wallace's major depressive disorder, PTSD, and social phobia were severe impairments.  (*Id.*)  Conversely, the ALJ found that Wallace's ankle problems, back pain, and obesity were not severe impairments.  (AR 9-10.)  Next, the ALJ determined that Wallace did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (AR 10-11.)

The ALJ then determined Wallace's RFC, finding that she was able to perform "a full range of work at all exertional levels but is limited to simple instructions and cannot work in a stressful environment."  (AR 11.)  At step four, the ALJ found that Wallace had

4

no past relevant work.  (AR 13.)  At step five, the ALJ found that "there were jobs that existed in significant numbers in the national economy that [Wallace] could have performed."  (*Id.*)  More specifically, the ALJ determined that a finding of "not disabled" was appropriate "under the framework of section 204.00 in the Medical-Vocational Guidelines."  (AR 14.)  The ALJ concluded that Wallace had not been under a disability, as defined in the Social Security Act, from April 15, 2003, the alleged onset date, through June 30, 2009, the date last insured.  (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual

review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

### I.    Back Pain

Wallace asserts that the ALJ erred in finding that her back pain was not a severe impairment and in failing to incorporate this impairment into his RFC assessment.  The ALJ clearly explained his findings with respect to Wallace's back pain, as follows:

> [T]he record shows that [Wallace] has had occasional back pain with radiculopathy.  However, symptoms resolved quickly with pain medications and physical therapy.  [Wallace] wrote that she usually has

> problems two or three times per year, although the medical record does not
> support [that] level of frequency (Exhibits 5E, 2F, 4F, 9F).  At the hearing,
> [Wallace] testified that her doctor and therapist have indicated that her
> back pain was related to stress.  The record establishes that this impairment does
> not meet [the] Social Security Act's durational requirement.

(AR 9-10.)  Substantial evidence supports these findings.  (*See, e.g.,* AR 260, 393, 413,

415, 510, 512.)  Specifically, although Wallace experienced back pain in February 2008,

by approximately one month later, in March 2008, the pain had "almost fully resolved"

and occurred only "at rare intervals" and usually "resolved spontaneously."  (AR 260.)

Although she complained of back pain at various other times, the record reveals that she

did not seek medical attention to treat it.  The Second Circuit has held that the ALJ is

entitled to rely on such lack of evidence of treatment, stating that: "The [Commissioner]

is entitled to rely not only on what the record says, but also on what it does not say."

*Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983).  Moreover, medical notes

indicate that on at least two occasions, Wallace's back pain was caused by increased

physical activity, including "shoveling snow" in December 2003 (AR 415) and

"increase[d] work around the house and . . . moving things" in July 2008 (AR 257).  On

another occasion when Wallace complained of back pain, medical notes indicate that her

life had been "very hectic" at the time, with both her mother and her husband being

admitted to the hospital.  (AR 393.)

　　　　Overall, the record supports a finding that, during the alleged disability period,

Wallace's back pain had "no more than a minimal effect on . . . her physical or mental

abilit[y] to perform basic work activities."  SSR 85-28, 1985 WL 56856, at *3 (1985)

("An impairment or combination of impairments is found 'not severe' and a finding of

'not disabled' is made at . . . step [two] when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work . . . (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability[y] to perform basic work activities).").  Accordingly, I find that the ALJ did not err in determining that Wallace's back pain was not a "severe" impairment.  I also find that the ALJ did not err in failing to include any restrictions in his RFC assessment based on Wallace's back pain, given that the record does not demonstrate that Wallace's back pain – alone or in combination with other impairments – functionally limited her ability to do basic work activities.  *See* SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) ("While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim.").

## II.   Medical Opinions

Wallace asserts that the ALJ failed to adequately consider and weigh the opinions of several of her treating and non-treating medical sources.  As discussed below, I find that, although certain of the ALJ's stated reasons for assigning limited weight to particular opinions are unsupported, the errors are harmless, given that the record supports the ALJ's ultimate conclusions with respect to the following medical opinions.

### A.   Social Worker Small

Janine Small, LICSW treated Wallace from October 2005 through the date of the ALJ's decision.  (AR 359.)  In August 2010, Small completed a Medical Source

Statement of Ability to Do Work-Related Activities (Mental), in which she checked off boxes indicating that Wallace was "markedly limited or effectively precluded" from engaging in all twenty listed "work-related qualit[ies]."  (AR 732-33.)  Small explained that Wallace's "social phobia and frequent panic attacks frequently interfere[d] with her ability to perform th[ose] tasks."  (AR 733.)  The ALJ gave "limited weight" to this opinion, on the grounds that it was "not supported by treatment notes" and Small was not an "acceptable medical source."  (AR 12.)

It is true that Small was not a physician or psychologist, and thus, the ALJ was not required to analyze her opinion under the treating physician rule.  20 C.F.R. § 416.913(a).  But the ALJ's statement that, because Small was not an "acceptable medical source," her opinion should be afforded "only limited weight," misrepresents the applicable regulatory law.  In fact, Social Security Ruling ("SSR") 06-03p explicitly requires ALJs to evaluate the opinions of medical sources who are not "acceptable medical sources" – including nurses, physicians' assistants, therapists, and licensed clinical social workers such as Small – in some depth.  SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006).  The ruling states: "Opinions from these [other] sources . . . who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  *Id.*  The ruling then directs ALJs to use the same factors for the evaluation of opinions from these "other sources" as are used to evaluate opinions from "acceptable medical sources," including treating physicians.  *Id.* at *4 (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)).  These factors include but are not limited to the

9

length of the treatment relationship, the frequency of evaluation, and the degree to which the medical source provided evidentiary support for his or her opinion.  *Id.*

The ALJ did not consider a key factor in evaluating the weight of Small's opinion: Small had treated Wallace for approximately five years as of the date of the ALJ's decision; and had seen her frequently (weekly or bi-weekly) during that time.  This was error.  But the error was harmless, given that the ALJ did give a good and valid reason for affording limited weight to Small's opinion, namely that Small's treatment notes do not support her opinions regarding Wallace's functional limitations.[1]  In fact, taken as a whole, Small's treatment notes indicate that, although Wallace experienced a great deal of stress in her life, including in her respective relationships with her mother, husband, and father-in-law, overall she was doing well and able to function during the alleged disability period.  For example, in 2006, two of Small's treatment notes state: "[Wallace] continues to do well with fewer depressive [symptoms] and less frustration with mother" (AR 322); and, "[Wallace] appeared much brighter today than past visits and confirmed she was feeling much less depressed" (AR 327).  And in 2009, some of Small's treatment notes state that Wallace was "doing well" (AR 701), "doing well despite ongoing conflict [with] husband" (AR 702), and feeling "[b]right [and] positive today, although still [has] a cold and [is] not feeling well" (AR 704).  While there were other days reflected in

---

[1] Citing to a First Circuit decision, Wallace argues that, as a matter of law, an ALJ may not reject a treating source's opinion on the grounds that it is not supported by treatment notes.  But in fact, the applicable regulation requires ALJs to consider whether a medical opinion is "supported" by "relevant evidence" and "consistent . . . with the record as a whole" in determining the weight of such opinion.  20 C.F.R. § 404.1527(d)(3), (4).  Clearly, the treating provider's own treatment notes are included in the "relevant evidence" and "the record as a whole."  Therefore, it was not legal error for the ALJ in this case to have afforded limited weight to Small's opinion on the partial grounds that such opinion was not supported by Small's own treatment notes.

Small's treatment notes where Wallace was feeling very anxious and stressed (AR 709) and was tearful (AR 710), those days appear to have arisen based on particular situations, including interactions with family members who experienced problems of their own, such as her husband who was battling alcoholism and other substance abuse issues.  As the ALJ accurately stated, much of Wallace's treatment with Small "focused on situational interactions between [Wallace] and her immediate [family]" rather than underlying mental impairments.  (AR 12; *see, e.g.,* AR 293-358, 395-404, 578-90, 701-30.)

Moreover, the record reflects that Small was effectively treating Wallace so that she could continue functioning despite her familial problems.  As the ALJ noted, in January 2010, Small's notes reveal that Wallace was feeling well enough to reduce the frequency of treatment from every week to every two weeks.  (AR 12 (citing AR 581 ("[Wallace] agreed she has made enough progress [that] she can drop to every other week")); *see also* AR 403 ("continues to feel good . . . [m]ay drop sessions to biweekly").)  Despite Wallace's claim to the contrary, changes with respect to the frequency of a disability claimant's treatment are relevant to the ALJ's assessment of the claimant's functional limitations.  *See* 20 C.F.R. § 404.1529(c)(3).  Small's treatment notes also reveal that she repeatedly assigned Wallace a Global Assessment of Functioning ("GAF") score of 60 (*see, e.g.,* AR 273-79)[2], which indicates only moderate symptoms and moderate difficulty in social, occupational, or school functioning, *see* Am.

---

[2] Wallace asserts that Small's records "appear to simply carry forward the GAF score of 60 throughout the treatment period," implying that the GAF score assigned therein was the result of computer error.  (Doc. 16 at 6-7.)  There is no evidence to support this assertion, however, and in fact, Small's treatment notes consistently support a GAF score of 60.

Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th ed. 2000).  Although a claimant's GAF score at any given time, in and of itself, does not demonstrate that the claimant was unable to perform substantial gainful activity, it is "one factor" to consider in assessing the claimant's functional limitations.  *Parker v. Astrue*, No. 2:10-cv-195, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011) (citation omitted).  Therefore, it was proper for the ALJ to note that "Small has generally found that [Wallace's] global assessment of functioning is 60 . . . ."  (AR 13.)

### B.    Dr. Lovko/Nurse Morgan

In a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Teddi Lovko, MD and Wende Morgan, FNP[3] jointly opined that Wallace was "markedly limited or effectively precluded" from engaging in nine out of twenty "work-related qualit[ies]."  (AR 605-06.)  In addition, Nurse Morgan wrote: "[Wallace] is often overwhelmed by the emotional requirements of daily living – while her depression is severe, her decision[-]making, insight, judgment, memory[,] and cognition are impaired." (AR 606.)  Moreover, in a letter dated February 26, 2010, Morgan stated that she "certainly believe[d] that [Wallace] [wa]s able to care appropriately for her child and perform the day to day functions of family life, such as organizing meals, clean clothing, etc., but it [was] quite likely that more than that would [have] be[en] beyond her ability unless her depression [wa]s under better control."  (AR 557.)  As with Small's opinion, the ALJ gave "limited weight" to these opinions.  (AR 12.)  Wallace asserts that this

---

[3] In his decision, the ALJ erroneously referred to "Wayne Powell, FPMHNP" instead of Nurse Morgan as the co-signer on this document.  (AR 12; *see*  AR606.)  The parties appear to agree that this error was harmless.  (*See* Doc. 16 at 3 n.4.)

finding was erroneous, and that the ALJ failed to give good reasons in support thereof.

I find that, regardless of the reasons given by the ALJ for giving limited weight to the opinions of Nurse Morgan and Dr. Lovko, they are not entitled to more than the "limited weight" afforded by the ALJ.  With respect to Dr. Lovko, Wallace fails to demonstrate what kind of treatment relationship, if any, they had; and it is unclear whether Dr. Lovko ever examined or met with Wallace.  As noted by the ALJ, "there are very few, if any, treatment records involving Dr. Lovko and [Wallace]."  (AR 12.)  It appears from the record that Dr. Lovko's only involvement in Wallace's care was signing the Medical Source Statement completed by Nurse Morgan.  Therefore, it is difficult to assess the weight of Dr. Lovko's opinion, and the ALJ was not required to analyze it under the treating physician rule.  *See Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) (defining a "treating physician" as "[a] claimant's . . . own physician . . . or psychologist . . . who has provided the [claimant] with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual").

Moreover, the opinion signed by Dr. Lovko was clearly made by Nurse Morgan, and Nurse Morgan herself severely discounted that opinion, stating as follows in a February 2010 letter:

> I have provided my opinion on the mental health forms you sent me, but . . . [Wallace's] long[-]time therapist Janine Small and her current medication prescriber, Wayne Powell, NP, would be able to render a more valuable opinion than mine.  I have spent about 2 ½ hours with [Wallace] in the past 10 months, and . . . [have] not seen her for 5 months.

(AR 557.)  Furthermore, as with Small's opinion, the ALJ gave a good and valid reason for giving limited weight to Nurse Morgan and Dr. Lovko's opinions, namely, that they

are unsupported by treatment notes.  Not only does Wallace fail to point to any treatment notes prepared by these providers which support their opinions, they are also inconsistent with Small's treatment notes, as discussed above.

### C.    Dr. Mooney

In January 2009, Wallace underwent a consultative psychological examination with Dean J.M. Mooney, PhD, NCSP.  (AR 367-71.)  Dr. Mooney diagnosed Wallace with major depressive disorder and PTSD, and stated that further evaluation was needed to determine whether she met the criteria for bipolar disorder.  (AR 370-71.)  The Doctor further stated that Wallace should remain in psychotherapy "to help cope with her anxiety and depressive cognitions," and should remain in contact with her primary care doctor "to monitor her physical well-being."  (AR 371.)  Dr. Mooney assigned Wallace with a GAF score of 40, but implicitly diminished the impact of such assignment by noting that the "greatest usefulness" in a GAF score "is in tracking changes in the person's level of functioning *across time*."  (AR 370 (emphasis added).)  The record reflects that Dr. Mooney met with Wallace on only one occasion and therefore was unable to track her level of functioning across time.  In contrast, Small treated Wallace approximately every week or every other week, as discussed above, and consistently assigned Wallace with a GAF score of 60.  The ALJ properly gave "very little weight" to Dr. Mooney's assignment of a low GAF score to Wallace, in part, on the grounds that such score was inconsistent with Small's steady assignment of a much higher GAF score across time and throughout their extensive treatment relationship.  (AR 12-13.)  Moreover, Dr. Mooney's own evaluation of Wallace does not support a functioning level of 40, which denotes

"[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM-IV at 32.  Rather, Dr. Mooney noted during his evaluation of Wallace that she appropriately communicated with the Doctor; she was "attentive and cooperative"; her affect remained "stable"; her thought processes were "logical and goal[-]directed"; she "displayed no evidence of psychosis or severe thought disturbance"; and she had no cognitive impairment.  (AR 367-70.)

## III.    RFC Determination

According to Wallace, the "most critical problem" with the ALJ's decision (Doc. 16 at 7) is his determination that Wallace's only functional mental limitations were that (a) she was limited to following "simple instructions," and (b) she could not work in a "stressful environment" (AR 11).  I agree, and find that the ALJ's mental RFC determination is inadequate and not supported by substantial evidence.

At step three of the sequential evaluation, just prior to making his RFC determination, the ALJ gave "great weight" to the opinions of agency consultants Drs. Farrell and Hurley, stating that they were "consistent with treatment notes" and citing to the relevant evidence.  (AR 11.)  In relevant part, Dr. Farrell opined that Wallace was moderately limited in her ability to interact with the general public and get along with coworkers or peers; "would work best if she did not have to interact with strangers including the general public and coworkers"; and had sufficient concentration,

15

persistence, and pace to sustain for only "two[-]hour blocks of time in 3+ step low stress work activities."  (AR 374-75.)  Dr. Hurley affirmed these opinions.  (AR 407.)  Without explanation, and despite noting himself at step three that Wallace had "moderate difficulties" in social functioning and concentration, persistence, and pace (AR 10), the ALJ's RFC determination failed to account for these specific limitations.

Although ALJs are not required to adopt every facet of each medical opinion to which they afford great weight, in this case, the ALJ should have explained his rejection of the critical portions of the only two medical opinions on which he relied (those of agency consultants Drs. Farrell and Hurley) in determining Wallace's RFC.  Social Security Ruling ("SSR") 96-6p states that, "RFC assessments by State agency medical or psychological consultants . . . are to be considered and addressed in the [ALJ's] decision as medical opinions from nonexamining sources about what the [claimant] can still do despite his or her impairment(s).  SSR 96-6p, 1996 WL 374180, at *4 (Jul. 2, 1996).  And SSR 96-8p provides that, "[i]f the [ALJ's] RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *7 (Jul. 2, 1996).  These rulings particularly apply in this case, given that substantial evidence supports the agency consultants' opinions.  (*See, e.g.,* AR 27, 129-30, 134, 167, 369-71, 529-30, 539, 568-69, 605-06, 732-33.)  Instead of explaining his rejection of the agency consultants' (and other medical providers') opinions regarding Wallace's limitations in social functioning and concentration, persistence, and pace; the ALJ improperly fashioned an RFC based merely on his own judgment.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[T]he ALJ cannot

arbitrarily substitute his own judgment for competent medical opinion.") (quotation marks omitted); *Gray v. Chater*, 903 F. Supp. 293, 301 (N.D.N.Y. 1995) ("RFC is a medical assessment; therefore, the ALJ is precluded from making his assessment without some expert medical testimony or other medical evidence to support his decision.").

Not only does the ALJ's RFC determination fail to account for Wallace's demonstrated limitations in social functioning and concentration, persistence, and pace; it also fails to describe or define with any specificity what workplace activities or situations Wallace was unable to perform, stating merely that Wallace could not work in a "stressful environment."  (AR 11.)  The Commissioner has recognized the importance of examining a claimant's individual capacity to handle stress, stating: "The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances."  SSR 85-15, 1985 WL 56857, at *6 (1985).  One district court explained:

> Because stress is "highly individualized," mentally impaired individuals "may have difficulty meeting the requirements of even so-called 'low-stress' jobs," and *the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work.*

*Stadler v. Barnhart*, 464 F. Supp. 2d 183, 188-89 (W.D.N.Y. 2006) (citing SSR 85-15) (emphasis added).  Applying this principal, the First Circuit found that, without an explanation of the claimant's vocational abilities in light of his anxiety disorder, there was no basis for the ALJ's conclusion that the claimant could perform low stress work.  *See Lancellotta v. Sec'y of Health and Human Servs.*, 806 F.2d 284, 285 (1st Cir. 1986).

On remand, the ALJ should make a new RFC determination, this time accounting for Wallace's moderate limitations with respect to interacting with members of the public and co-workers and sustaining concentration, persistence, and pace for more than two-hour blocks of time; and making more specific findings about Wallace's inability to work in a stressful environment.  To that end, the ALJ may wish to obtain new evaluations from Dr. Farrell and/or Dr. Hurley, or another medical consultant, given that additional evidence has been incorporated into the record since the date Dr. Farrell's and Dr. Hurley's opinions were made (February and May 2009, respectively).  (*See, e.g.,* AR 524-56, 557-606, 701-33.)  *See Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is "unclear" whether agency consultant reviewed "all of [plaintiff's] relevant medical information," consultant's opinion is not supported by evidence of record, as required to override the opinion of a treating physician).

Moreover (and although not specifically argued in Wallace's motion), on remand, the ALJ should consider and address the opinion of Wallace's treating nurse, Wayne Powell, NP.  (AR 565-70.)  In his decision, as noted above, the ALJ confuses Nurse Powell with Nurse Morgan.  More importantly, the ALJ neglects to discuss Nurse Powell's July 2009 Behavioral Health Diagnostic Evaluation, which includes the following opinion:

> [Wallace] . . . shows a significant range of depressive disorder of a recurrent nature of moderate-to-severe severity [and] also shows significant symptoms of social phobia which appears to stem from her previous trauma history and lack of trust of others as a result of this trauma.  She appears motivated to improve her situation and has been engaged in individualized therapy which I strongly encourage continuing.  I believe, however, that due to the severe nature of her trauma beginning at an early age, many of

> her symptoms may be difficult to change due to the fact that this trauma has clearly influenced her personality development.  As such, I believe her prognosis is somewhat guarded.

(AR 568-69.)  This opinion was made approximately two weeks after the expiration of Wallace's insured period (*see* AR 7, noting that Wallace was insured for benefits through only June 30, 2009).  Nonetheless, it is clearly relevant to the ALJ's mental RFC determination, and the ALJ neglected to consider and weigh it in his decision.

## IV.     Application of the Medical-Vocational Guidelines

Next, I find that the ALJ's step-five determination that Wallace's nonexertional limitations "had little or no effect on the occupational base of unskilled work at all exertional levels" is unexplained and unsupported by the record; and thus, the ALJ erroneously applied the Medical-Vocational Guidelines ("the Guidelines") to find that there were jobs existing in significant numbers in the national economy that Wallace could perform.  (AR 14.)

In determining whether work exists for a claimant, an ALJ may rely on the Guidelines "only if [their] evidentiary underpinnings coincide exactly with the evidence of disability appearing on the record."  *Pearson v. Bowen*, 866 F.2d 809, 811 (5th Cir. 1989) (quotation marks omitted).  The Guidelines state: "Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled."  20 C.F.R. Part 404, Subpart P, Appendix 2 (Guidelines) § 200.00(a); *see also* 20 C.F.R. § 404.1569.  Moreover, the Guidelines take into account only exertional impairments; therefore, if a claimant suffers from nonexertional impairments, use of the

19

Guidelines is appropriate only if those impairments "do not significantly diminish the claimant's residual capacity to perform the activities listed in them." *Evans v. Chater*, 84 F.3d 1054, 1056 (8th Cir. 1996); *see Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986); *Manns v. Shalala*, 888 F. Supp. 470, 483-84 (W.D.N.Y. 1995) ("Even when there is a nonexertional impairment, it is permissible for the ALJ to resort to the grids, provided that the ALJ finds, and the record supports the finding, that the nonexertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the grids."). A claimant's work capacity is "'significantly diminished'" if there is an "'additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Bapp v. Bowen*, 802 F.2d at 606).

Thus, where nonexertional limitations are involved, the ALJ must "go beyond the [Guidelines]" and "make findings relating to the severity of [the claimant's] nonexertional limitations and the effects of such limitations on [the claimant's] residual functional capacity before making a determination granting or denying benefits." *Munks v. Heckler*, 580 F. Supp. 871, 874-75 (N.D. Ill. 1984) (citing *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982)). One district court applied this rule as follows:

> In the instant case, the ALJ noted plaintiff's nonexertional limitations but failed to make specific findings. The conclusory statement of the ALJ that "[t]he claimant's nonexertional limitations do not significantly affect his residual functional capacity for unskilled sedentary work..." standing alone, is insufficient. *Full and detailed findings of fact are essential to the [Commissioner's] decision and are required. . . . [T]he failure of the ALJ to make specific findings in support of the conclusion that plaintiff's*

> *nonexertional limitations do not affect his functional capacity requires this*
> *Court to remand the matter to the ALJ to further develop the record*.

*Id.* (internal citations omitted) (emphasis added).

In this case, the ALJ found that Wallace's ability to perform work at all exertional levels was "compromised by nonexertional limitations." (AR 14.) Yet the ALJ did not state what those "nonexertional limitations" were. As noted above, the ALJ further found – without explanation or analysis – that Wallace's nonexertional limitations "had little or no effect on the occupational base of unskilled work at all exertional levels," and thus applied the framework of section 204.00 of the Guidelines to find that Wallace was "not disabled." (*Id.*) In light of the above law, the ALJ should reconsider this determination on remand, and provide findings in support of his ultimate conclusion regarding the effect of Wallace's specific nonexertional limitations on her functional capacity.

## V.     Vocational Expert

Finally, given the ALJ's finding that Wallace's ability to work was "compromised by nonexertional limitations" (AR 14), on remand, the ALJ should employ the services of a vocational expert to assist in assessing whether Wallace could perform jobs existing in significant numbers in the national economy. Although "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert," *Bapp v. Bowen*, 802 F.2d at 603, it is widely held that, "where the claimant's nonexertional impairments . . . significantly diminish his capacity to perform the full range of activities listed in the [Guidelines], the [Commissioner] must produce expert vocational testimony or other similar evidence to establish that there are jobs available in

the national economy for a person with claimant's characteristics," *Manns v. Shalala*, 888

F. Supp. at 484 (citations omitted).

## Conclusion

For these reasons, I recommend that Wallace's motion be GRANTED, in part; the

Commissioner's motion be DENIED; and the matter be REMANDED for further

proceedings and a new decision, in accordance with this opinion.

Dated at Burlington, in the District of Vermont, this 10th day of January, 2012.

/s/John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after
service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge
and all parties, written objections which shall specifically identify those portions of the
Report and Recommendation to which objection is made and the basis for such
objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).
Failure to timely file such objections operates as a waiver of the right to appellate review
of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P.
72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).